## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

KAREN R. ROSBY                                                                    PLAINTIFF

v.                                         No. 4:08CV04108 JLH

UNUM LIFE INSURANCE COMPANY
OF AMERICA                                                                        DEFENDANT

### OPINION AND ORDER

This is an ERISA action in which Karen Rosby seeks to recover benefits under the long term disability plan offered by her employer, Entergy Services, Inc. ("Entergy"), through Unum Life Insurance ("Unum") pursuant to 29 U.S.C. § 1132. The parties have submitted an administrative record and briefed the issues, so the case is ripe for decision. For the following reasons, the decision of Unum, the claims administrator for the plan, is affirmed.

### I.

Karen Rosby was employed by Entergy as a customer service representative. Rosby's job responsibilities included processing customer inquiries over the telephone, discussing and explaining billing amounts, taking orders for new services or transfers of services, and referring customer complaints to other departments. (Adm. R. 23.) She also had to be available to work eight to ten hour shifts and emergency call outs as well as serve on storm duty. (Adm. R. 23.) Rosby generally worked eight to twelve hours each day at her desk. (Adm. R. 108.) Her job did not require her to stand or walk, except to and from the building where she worked. (Adm. R. 108.) Rosby participated in Entergy's long-term disability plan, which was funded by an insurance policy underwritten by Unum. Under the plan, Unum had discretionary authority to construe the terms of the plan and determine eligibility of benefits. Rosby filed a claim for long-term disability benefits with Unum in August 2007. (Adm. R. 35.) She reported that she had a history of back problems

following an automobile accident in 1999.  (Adm. R. 10.)  After she was in another automobile

accident on April 4, 2007, Rosby underwent spinal fusion at L5-S1 on July 30, 2007.  (Adm. R. 31.)

Rosby also reported that she could not sit for long periods at a time, bend, or lift anything. (Adm.

R. 31.)  As a result, Rosby did not believe she could work.

On June 12, 2007, Rosby saw Dr. Bernard Crowell who diagnosed her with "a history of

degenerative disc disease with disc desiccation at L4-L5 and at L5-S1." (Adm. R. 126.)  During that

visit, Crowell noted that she would be scheduled for surgery soon to address those problems.  Rosby

underwent spinal fusion at L5-S1 on July 30, 2007.  (Adm. R. 135.)  Crowell saw Rosby after the

surgery on August 14, 2007, and he reported that she still had mild pain in her lower back and some

pain in her thighs, which he suspected was due to her positioning on a table for therapy.  (Adm. R.

125.)  As part of her claim for benefits, Rosby filed a report by Crowell, dated August 14, 2007, in

which he wrote that her symptoms were back pain and left leg pain and restricted her from "lifting,

twisting, bending, stooping or squatting."  (Adm. R. 34.)  He also stated that she should be able to

work part-time by November 3, 2007, and full-time by April 3, 2008.  (Adm. R. 34.)

Rosby also provided a physician's statement from her chiropractor, Dr. Steven Bennett.  He

wrote:

> Based upon last functional capacity test performed in this office in June, 2007.  There
> was significant restriction of range of motion throughout the spinal regions this
> resulted in a 26% whole person impairment just as result of loss of range of motion.
> [Patient] also exhibiting weakness in left upper extremity.

(Adm. R. 38.)  Bennett found "a retrolisthesis of C5 as well as hypermobility at C1 on motion x-ray

studies." (Adm. R. 39.)  He concluded, "The hypermobility and retrolisthesis of C5 is secondary to

ligament damage in the cervical spine." (Adm. R. 39.)  Bennett listed Rosby's limitations as lifting

heavy weights, sitting for hours at a time, traveling long distances, walking a mile without stopping,

and participating in social activities that are strenuous.  (Adm. R. 38.)  Bennett also commented

about the prospect of Rosby returning to work: "They had also referred her to another physician.  If

her condition has deteriorated it would be undetermined when she may be able to return to work."

(Adm. R. 39.)

Unum pre-approved Rosby's request for disability benefits on October 23, 2007.  The letter

from Eric Waddle, the disability specialist assigned to Rosby's claim, stated that the records

supported her disability claim through October 30, 2007, and that any benefits beyond that date

would require updated information.  (Adm. R. 311.)  The letter specifically referred to getting an

update on restrictions and limitations from Crowell following her visit on October 18, 2007.  (Adm.

R. 311.) The letter also informed Rosby that her elimination period began on June 25, 2007, and was

scheduled to end on December 22, 2007.  (Adm. R. 311.)  Thus, on December 22, 2007, benefits

would be payable to the extent medical documentation was available regarding her restrictions and

limitations.  (Adm. R. 310-12.)

On October 30, 2007, Crowell provided Unum with a list of restrictions and limitations:

Rosby could not stand for more than fifteen to twenty minutes, sit in one place for more than fifteen

to twenty minutes, kneel, stoop, squat, or lift objects greater than ten pounds.  (Adm. R. 326.)  He

opined that it might be possible for Rosby to return to work in "2 1/2 to 3 months, hopefully."

(Adm. R. 326.)  Based on this information, Unum's nurse reviewer, Thai Monroe, concluded that

Rosby's restrictions and limitations were supported only to allow time for recovery through

December 2007 and that the prognosis for returning to work in a sedentary job was good.  (Adm. R.

352.)

Crowell referred Rosby to Dr. Christopher Mocek for her hip and leg pain, and she saw

3

Mocek on October 25, 2007.  (Adm. R. 404.)  In his evaluation, which Unum received, he wrote:

> She is here today complaining of pain in her hips and down both legs.  She has had a fusion at L4/5 and L5/S1 disc level on July 30, 2007 by Dr. Crowell.  She says that it starts as a spasm and pain shoots down the right leg greater than the left. . . .  She says that the pain was worse in the left leg before the surgery now the pain is worse in the right leg.

(Adm. R. 404.)  He noted that an October 18 CT-scan showed "post transpedicular fusion involving the L5/S1 level," "[a]bnormal soft tissue attenuation noted anterior to the thecal sac, extending the left L5/S1 neural foramen, surrounding the exiting left L5 nerve root," and postoperative scarring. (Adm. R. 406.)  In his discussion of the planned treatment, Mocek wrote:

> This patient reported pain in both legs prior to surgery but the left was worse.  Now post back surgery the left is better but the right is worse.  The CT myelogram does not indicate any problems on the right.  We will treat the right leg pain with one or two selective nerve blocks and PT.  If the right leg pain persists would recommend a lumbar stim trial.  We will provide her with medication management of this chronic spine pain.

(Adm. R. 406.)  On December 27, 2007, Mocek signed an attending physician statement which said that Rosby suffered from back and leg pain.  (Adm. R. 402.)  Unlike Crowell, Mocek did not list any restrictions or limitations for Rosby, but he noted that the "[patient] needs FCE to determine physical capabilities."  (Adm. R. 403.)

On January 10, 2008, Unum informed Rosby that it was in the process of updating her medical records to determine if her claim for disability still was supported.  (Adm. R. 416.)  After following up with Rosby's doctors, Unum learned that Rosby last saw Crowell on January 8, 2008, and that she did not have any more follow-up visits scheduled with him at that time.  (Adm. R. 422.)  Crowell's office informed Unum that Rosby had been referred to Mocek for pain management and was under his care.  (Adm. R. 441.)  Crowell had not released Rosby to work and had told her to sit or stand for no more than fifteen to twenty minutes at a time.  (Adm. R. 422.)

After Unum sought information about Rosby's restrictions and limitations from Mocek and received no additional information, Unum asked Rosby to undergo a functional capacity evaluation ("FCE") as Mocek had suggested.  (Adm. R. 512.)  On March 18, 2008, physical therapist Stuart Jones conducted the FCE and concluded that Rosby could sit frequently (up to five hours in an eight-hour day) stand occasionally (up to two hours in an eight-hour day), and walk occasionally.  (Adm. R. 547.)  The FCE also revealed that Rosby was unable to bend, twist, kneel, or squat.  (Adm. R. 547.)  Although Rosby engaged in "inconsistent and self-limiting behavior" during the FCE, Jones concluded that Rosby could work an eight-hour work day for a forty-hour week in a sedentary job. (Adm. R. 547.)

Unum ordered a video surveillance of Rosby to coincide with the FCE.  On March 17, 2008, investigators saw Rosby standing for a few minutes at a time, riding in a vehicle short distances, and carrying a glass tabletop approximately three to four feet long and ten inches wide.  (Adm. R. 579-89.)  Rosby carried the tabletop under her right arm while she was talking on her cell phone, which she held in her left hand.  (Adm. R. 584.)  At one point, Rosby sat as a passenger in a vehicle for thirty-five minutes.  (Adm. R. 585.)  On March 18, 2008, investigators watched Rosby enter and leave Jones's office for the FCE.  (Adm. R. 586-87.)  Although she had not used a cane on March 17, on March 18, the day of the FCE, Rosby arrived at Jones's office using a cane. (Adm. R. 584-86.) After the FCE, Rosby stayed seated in her vehicle for forty-five minutes, traveling from Jones's office to a bank, where her husband exited the car and went into the bank, and then home.  (Adm. R. 587-88.)

After the video surveillance and FCE, Unum asked vocational rehabilitation specialist Thomas Waymire to conduct an occupational assessment based on Rosby's FCE.  Waymire

recommended terminating Rosby's benefits. (Adm. R. 577.)

On March 31, 2008, Unum notified Rosby that it was terminating her benefits. (Adm. R. 612.) Rosby appealed the termination by letter dated April 18, 2008, claiming that she could not sit or stand for longer than thirty minutes and was required to sit for eight to twelve hours in her job at Entergy. (Adm. R. 657.)

Crowell continued to provide Unum with information regarding Rosby's physical restrictions and limitations. On April 23, 2008, Crowell faxed Unum an updated attending physician statement that diagnosed Rosby with "chronic back pain with radicular symptoms, Degenerative Disc Disease Lumbar spine, Instability L5-S1, S/P Lumbar Fusion." (Adm. R. 673.) Crowell listed Rosby's restrictions and limitations: sit or stand for more than twenty minutes, climb, twist, bend, stoop, or reach above shoulder level. (Adm. R. 674.) Crowell also filled out an Estimated Functional Abilities Form. Based on his clinical experience, he concluded that Rosby was unable to sit for six to eight hours. (Adm. R. 677.) By letter dated April 15, 2008, Crowell advised Unum to "hold off on the functional capacity evaluation" because it was "still too soon for her to undergo such an evaluation since the normal healing time for a lumbar back fusion is approximately one year." (Adm. R. 731.)

On May 19, 2008, Unum clinical consultant Karen York reviewed Rosby's medical records. (Adm. R. 770-81.) York noted that Rosby's records were consistent with reports of persistent low back and right hip pain and that the CT scan revealed soft tissue attenuation surrounding the exiting left L5 nerve root and post-operation scarring. (Adm. R. 779.) York also acknowledged that the restrictions and limitations offered by Dr. Crowell–including the restriction against sitting or standing for more than twenty minutes at a time–were reasonable. (Adm. R. 780.) However, York

concluded that Rosby's exam findings were "unremarkable," and Rosby "ha[d] obtained relief from the Fentanyl patch." (Adm. R. 779.) Thus, York found "a lack of measurable or observable evidence to support claimant's inability [to work] . . . as long as she is afforded opportunities to change positions." (Adm. R. 780.)

Unum then referred Rosby's file to Dr. Isadore Yablon, an orthopedic surgeon and medical consultant for Unum. Yablon determined that "Rosby can be gainfully employed doing sedentary work." (Adm. R. 790.) To resolve the disagreement between Crowell and Yablon regarding Rosby's ability to work, the doctors conducted a peer-to-peer review by telephone on June 17, 2008. (Adm. R. 802-03.) Yablon documented the conversation in a follow-up letter:

> You [Crowell] were asked whether your restrictions and limitations were based on your clinical experience and you answered in the affirmative. You were asked whether there was any diagnostic testing to support the level of [restrictions and limitations] which were imposed and you stated that the MRI scans supported your [restrictions and limitations]. . . .
>
> [Rosby's] observed activities were brought to your attention and you stated that her condition would permit her to walk and get in and out of a car. You were asked whether she could do sedentary work and you answered in the affirmative stating that she could lift up to 10 pounds with frequent breaks. She could sit for 30-45 minutes and her breaks should last for 5-10 minutes. . . . You further stated that her pain doctor thinks that the level above the fusion, mainly L4-5, has become a pain generator . . . .

(Adm. R. 811.) On July 14, 2008, Crowell responded. He indicated that Rosby might undergo a discogram. (Adm. R. 828.) He also reported:

> *Apparently*, she is still in a lot [of] pain and *feels* she is unable to perform the duties of sedentary work. She is unable to lift up to ten pounds even with frequent breaks. *She feels* she cannot sit for upwards of 30-40 minutes and that she has to changes [sic] and move more frequently. *If she does indeed have discogenic back pain* at L4-L5 above the fusion this would explain why she has done poorly since the first surgery . . . . Currently, I would restrict her from all duties sedentary and any lifting or sitting and see what the results of her pain doctor are. It is possible she may never return to employment.

7

(*Id.*) (emphases added).  On July 16, 2008, Yablon provided an analysis of Crowell's response.

Yablon stated that Crowell's letter did not change her opinion because "no pain generator was

identified," and "there are differing opinions of the efficacy of a discogram since a great deal of the

response of such a test involves the patient's cooperation and interpretation."  (Adm. R. 834.)

Ultimately, Yablon found "a marked difference of opinion [] between Dr. Crowell and myself."

(Adm. R. 835.)

Unum then asked Dr. Charles Sternbergh to review Rosby's records.  He agreed with

Yablon's analysis, reasoning:

> The claimant has no neurological deficit and imaging has not documented surgical
> complications or accelerated degenerative changes at L4-5.  The claimant has been
> provided chronic narcotics and injection strategies.  Observation of the claimant's
> activities reveal normal gait and ability to stand without difficulty.  However, during
> an FCE, the claimant demonstrated slow and guarded motions and consistently
> submaximal effort. . . .  The claimant's complaints of pain are in excess of
> observations, anatomic, and physiologic data.

(Adm. R. 846.)  Sternbergh concluded that certain restrictions and limitations were appropriate: "[I]t

would be reasonable to expect the claimant to sustain sedentary work activities with accommodation

to change positions as needed for comfort, and with no requirement for repetitive bending, lifting,

or twisting.  Lifting limitation would be 10 pounds occasionally."  (Adm. R. 846.)  In light of this

review, Unum's senior vocational rehabilitation consultant Shannon O'Kelley concluded that Rosby

could perform her job within the restrictions and limitations that Sternbergh provided. (Adm. R.

848.) On July 28, 2008, Unum upheld its decision to terminate Rosby's benefits.  (Adm. R. 857-59.)

## II.

Although the plaintiff has filed a motion for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure, the scheduling order that was issued by this Court on

November 24, 2008, instructed the plaintiff to brief the Court on the administrative record. Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the written scheduling order controls the subsequent actions of the parties in a case. FED. R. CIV. P. 16 advisory committee's note. The order may only be modified for good cause and with the judge's consent. FED. R. CIV. P. 16(b)(4). Because neither party requested a modification to the scheduling order, this Court will regard the plaintiff's motion and accompanying brief filed as the party's ERISA brief.

### III.

Section 502(a)(1)(B) of ERISA provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (2006). Essentially, "ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Norris v. Citibank, N.A. Disability Plan*, 308 F.3d 880, 883 (8th Cir. 2002). Although ERISA contains no standard of review, the Supreme Court has held that a reviewing court should apply a *de novo* standard of review unless the plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989). Where a disability plan includes express discretion-granting language, as this plan does,[1] a court reviews the administrator's decision for an abuse of discretion. *Farfall v. Mutual*

---

[1]Here, the plan states, in pertinent part:

Unum, as discretionary claims administrator, will have all powers and authority necessary or proper for such purpose. In furtherance of this duty, Unum will have the sole and exclusive power and discretion to construe, interpret, and resolve all questions concerning policy and claims administration, including but not limited to, (i) factual determinations, (ii) eligibility for benefits, (iii) amounts of benefits, and

*of Omaha Ins. Co.*, 324 F.3d 971, 973 (8th Cir. 2003); *Brown v. Seizt Foods, Inc., Disability Ben. Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998).

Under the abuse-of-discretion standard, the proper inquiry is whether Unum's decision was reasonable, or supported by substantial evidence. *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004). "Substantial evidence is 'more than a scintilla but less than a preponderance.' " *Smith v. Unum Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir. 2002) (quoting *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000)). " 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). Relevant evidence includes "all comments, documents, records, and other information submitted by the claimant relating to the claim." 29 C.F.R. § 2560.503-1(h)(2)(iv) (2009). An administrator's decision is reasonable if a reasonable person *could* have reached a similar decision given the evidence in the record; it is not whether a reasonable person *would* have reached that decision. *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002).

Under Entergy's long-term disability plan, a person is disabled when he or she is "limited from performing the material and substantial duties of [ her] regular job . . . and [she has] a 20% or more loss in [] indexed monthly earnings." (Adm. R. 66.) Material and substantial duties are those that "are normally required for the performance of [the claimant's] regular job" and that "cannot be

---

(iv) manner and timing benefits. All decisions of Unum in its capacity as discretionary claims administrator shall be final and binding on all parties and shall not be disturbed unless Unum's decisions are arbitrary and capricious.

(Adm. R. 57.)

reasonably omitted or modified." (Adm. R. 84.)  On October 23, 2007, Unum determined that Rosby

was not capable of performing the material and substantial duties of her job.  (Adm. R. 310-11.)  On

March 31, 2008, however, Unum determined that Rosby no longer was disabled and terminated her

benefits.  (Admin. R. 613.)

"[I]n determining whether an insurer properly terminated benefits that it initially undertook

to pay out, it is important to focus on the events that occurred between the conclusion that the

benefits were owing and the decision to terminate them." *McOsker v. Paul Revere Life Ins. Co.*, 279

F.3d 586, 590 (8th Cir. 2002).  The past payment of benefits does not create a presumptive burden

for the administrator to overcome; however, it is a factor to consider when the information available

to the administrator between the granting and terminating of benefits has not changed.  *Leger v.*

*Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 832 (7th Cir. 2009); *Hairston v. Loctite*

*Corp.*, No. 4:05CV01142 JLH, 2006 WL 568326, at *8 (E.D. Ark. Mar. 7, 2006).

Rosby argues that Unum erred when it discontinued her benefits because the decision was

based in large part on an FCE that Rosby claims is unreliable.  Specifically, Rosby argues that Unum

could not rely on the FCE because, in its letter to Rosby dated February 29, 2008, Unum

misrepresented the FCE as an examination by an independent medical examiner.  This argument is

unpersuasive for two reasons.  First, the letter Rosby received indicated that the type of exam to be

performed was a "Functional Capacity Evaluation (FCE)."  Second, under the plan, Unum could

require a claimant to be examined by "a physician, other medical practitioner, or vocational expert"

of its choice "as often as it is reasonable to do so."  (Adm. R. 66.)  Given this language, Unum was

within its rights under the plan to have Rosby examined by a physical therapist.

Rosby also suggests that the FCE instead is unreliable because the results of the examination

11

contradict of the opinion of Rosby's treating physician Dr. Crowell.  However, an ERISA plan administrator is not required to accord special deference to the opinions of a claimant's treating physician.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *Sizemore v. Baxter Healthcare Corp.*, No. 05-3030, 2007 WL 900635, at *9 (W.D. Ark. Mar. 26, 2007).  Nor is an administrator obligated to provide an explanation whenever it credits reliable evidence that conflicts with a treating physician's evaluation.  *Id.*  If performed properly, an FCE can support of an administrator's decision to terminate benefits.  *See Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 888 (8th Cir. 2002) (finding that a thorough FCE constituted more than a scintilla of evidence that the plaintiff was capable of working). Rosby offers no evidence to suggest that the FCE was not properly performed.[2]  Even with Rosby's "inconsistent and self-limiting behavior," Jones was able to determine that Rosby could return to work as long as she would be given ample opportunity to move around during the day.

The FCE was not the only piece of reliable evidence upon which Unum based its final decision to terminate benefits.  Unum also gathered video surveillance, two medical records reviews, and a vocational review, all of which indicated that Rosby was capable of performing the material and substantial duties of her job.  Rosby contends that together this evidence is not sufficient to rebut the contrary medical opinion of Dr. Crowell.  To support her contention, Rosby cites *Alfano v.*

---

[2]An FCE, which is generally conducted by a physical or occupational therapist, measures a claimant's current level of function within the context of the demands of competitive employment, activities of daily living, or leisure activities.  *Gordon v. Nw. Airlines, Inc. Long-Term Disability Income Plan*, 606 F. Supp. 2d 1017, 1028 n.15 (D. Minn. 2009).

In her brief, Rosby mentions that Dr. Mocek believed it was it was too soon after surgery to perform an FCE.  Were that the case, however, Rosby should not have been able to demonstrate sedentary work capacity in the FCE.  Presumably, her capacity to perform sedentary work would only increase over time.

12

*CIGNA Life Ins. Co.*, No. 07 Civ. 9661, 2009 WL 222351 (S.D.N.Y. Jan. 30, 2009).  In that case,

a treating physician's opinion was given substantial weight because the claims administrator did not

provide any rational justification for discrediting the physician's opinion. *Alfano*, 2009 WL 222351,

at *14.  In this case, however, the medical reviewers provided rational justifications for disagreeing

with Crowell.  Dr. Yablon pointed out that Crowell could not identify with any certainty a pain

generator in Rosby's medical records.  Furthermore, while Yablon and Sternbergh relied on Rosby's

medical records, the FCE, and the video surveillance to determine whether Rosby could perform

sedentary work, Crowell's opinion was based in large part on what Rosby told him about her

inability to work.  Given these medical reviews, in addition to the other available evidence, Unum

had sufficient evidence upon which to base its decision to terminate Rosby's long-term disability

benefits.

 Rosby also argues that Unum's status as a fiduciary with a conflict of interest must weigh

against its decision to terminate her disability benefits.  An insurer that serves as both plan

administrator and provider of benefits due under the plan operates under a conflict of interest.

*Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348, 171 L. Ed. 2d 299 (2008).  As provider,

the company has an economic incentive to increase its profits by paying fewer benefits, but as

administrator, it owes a fiduciary duty to pay benefits according to the terms of the plan.  *Id.*, 128

S. Ct. at 2349-50.  This conflict of interest is just one factor courts consider, however.  *Chronister*

*v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 776 (8th Cir. 2009).  Where the evidence otherwise

favors the decision of the plan administrator, the mere existence of a conflict of interest is not

sufficient to find an abuse of discretion. *Wakkinen v. Unum Life Ins. Co. of Am.*, 531 F.3d 575, 582

(8th Cir. 2008). It becomes more important when circumstances "suggest a higher likelihood that

13

[the conflict] affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Glenn*, 128 S. Ct. at 2351. It is less important when "the administrator has taken active steps to reduce potential bias." *Id.*

To support her claim, Rosby cites the 2004 and 2007 Reports of the Targeted Multistate Market Conduct Examination, a law review article referenced in the plaintiff's ERISA brief, and case law documenting Unum's history of biased claims administration. Although we are instructed by *Glenn* to give importance to this conflict of interest, taking into account the evidence discussed above, "we conclude that there is not a sufficiently close balance for the conflict of interest to act as a tiebreaker in favor of finding that Unum abused its discretion." *Wakkinen*, 531 F.3d at 582.

## CONCLUSION

For the reasons stated above, the decision of Unum, the claims administrator for the plan, is AFFIRMED.

IT IS SO ORDERED this 7th day of October, 2009.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE